UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

LEVELL MORGAN,

Plaintiff,

v. Case No. 23-cv-972-pp

MILWAUKEE COUNTY,

Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 64) AND DISMISSING CASE**

---

On July 20, 2023, the court received plaintiff Levell Morgan's complaint under 42 U.S.C. §1983 in which he asserted claims against Wellpath, LLC and Milwaukee County based on alleged inadequate medical care while he was confined at the Milwaukee County Jail. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on claims under the Fourteenth Amendment and Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). Dkt. No. 11. On November 19, 2024, Wellpath filed a Notice of Bankruptcy Filing and Imposition of Automatic Stay, dkt. no. 41, and on December 23, 2024, the court stayed the proceedings as to all defendants and administratively closed the case, dkt. no. 48. On August 28, 2025, the court lifted the stay, reopened the case, dismissed Wellpath and allowed the plaintiff to proceed against Milwaukee County only. Dkt. No. 59 at 6-7. The defendant has filed a motion for summary judgment. Dkt. No. 64. The plaintiff has filed opposition materials, dkt. nos. 82 (brief), 83 (response to proposed findings of fact), 84

(plaintiff's proposed findings of fact) and 85 (affidavit). The defendant has filed a reply brief in support of its motion (dkt. no. 89) and a reply to the plaintiff's proposed additional findings of fact (dkt. no. 90). This order grants the defendant's motion and dismisses the case.

## I. Facts[1]

The events relevant to this litigation took place during the plaintiff's pretrial detention at Milwaukee County Jail from August 16, 2021 through July 20, 2023. Dkt. No. 66 at ¶46. During that time, Wellpath provided medical care to individuals incarcerated at the jail. Id. at ¶¶2, 8. The plaintiff alleges that Milwaukee County and Wellpath have an unconstitutional policy or practice that caused inadequate and untimely medical treatment for his hernia, back, spine and nerve conditions, shoulder issues and accompanying pain. Id. at ¶¶3-4. The court allowed the plaintiff to proceed on a Monell claim against Milwaukee County and Wellpath based on "their alleged policy or practice of providing detainees inadequate or delayed medical care at the jail." Id. at ¶5. As noted, Milwaukee County is the sole remaining defendant. Id. at ¶7.

### A. Wellpath Policies

Wellpath has written policies and procedures governing the provision of medical care to individuals incarcerated at the jail. Id. at ¶12. It is Wellpath's policy that all such individuals have access to medical care, are treated appropriately for any conditions they may have and are provided with

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

appropriate medical care. Id. at ¶¶13-14. It also is Wellpath's policy that individuals receive an initial health assessment upon entering the jail. Id. at ¶15. Wellpath policy provides that individuals who have chronic diseases or other significant health conditions are identified in the initial health assessment and a personalized treatment plan is instituted, including regular follow-ups to monitor the condition. Id. at ¶16.

Wellpath policy provides that when a patient requires specialty care not available at the jail, the patient is sent off-site for specialty care. Id. at ¶18.[2] Under Wellpath policy, jail residents can request health care daily, and such requests are documented and triaged. Id. at ¶19. Wellpath providers regularly conduct sick calls and clinics to ensure timely responses to healthcare requests. Id. Jail patients' medical grievances are received and responded to directly by Wellpath. Id. at ¶20.

According to the defendant, Milwaukee County is not aware of any widespread pattern or practice of violations of Wellpath's express healthcare policies identified above. Id. at ¶21.[3] Wellpath does not follow a "cost containment" policy under which medical care, including offsite specialty care, is denied or delayed to save money. Id. at ¶22. The defendant states that

---

[2] The plaintiff states that the treatment he received shows that this policy has been implemented and used in an impermissible manner. Dkt. No. 84 at 2.

[3] The plaintiff states that Milwaukee County knew through the grievance system that Wellpath's business operations "were causing issues with respect to inadequate medical care, or lack thereof." Dkt. No. 83 at ¶21; Dkt. No. 84 at 7.

Milwaukee County is not aware of any policy or practice of Wellpath whereby it unduly delays provision of medical care, either on-site or offsite, for any reason, financial or otherwise.[4] Id. at ¶24.

B. The Jail's Healthcare Policies

The Milwaukee County Sheriff's Office Custody Manual contains policies intended to ensure that incarcerated individuals receive timely and appropriate healthcare treatment. Id. at ¶¶25-26. Jail staff are not trained medical professionals and are not qualified to determine the medical needs of incarcerated individuals. Id. at ¶27. Medical professionals employed by Wellpath make all decisions regarding medical care for incarcerated individuals. Id. at ¶28. When individuals confined at the jail submit medical request slips or medical-related grievances, jail staff involvement is limited to routing those requests and grievances to Wellpath for response. Id. at ¶29.

The contract between Milwaukee County and Wellpath provides that Wellpath is responsible for determining what medical care is appropriate and necessary for an incarcerated individual. Id. at ¶30. It is Milwaukee County policy and practice that jail residents receive routine appropriate medical care through its contract with Wellpath. Id. at ¶31. Jail policy provides that

[4] The plaintiff states that health staff repeatedly advise detained persons to put in pink slips about their medical issues but then fail to respond; he asserts that this should have made the defendant aware of the violations. He also argues that the defendant had a duty to know if Wellpath's policies were causing problems, and that a contract agreement, consent decree and request for proposal all required Wellpath to report about things like grievance logs, management reports, inmate requests, referrals and specialty consultations. Dkt. No. 83 at ¶¶23-24; Dkt. No. 84 at 9-12.

incarcerated individuals who need specialty care beyond the resources available in the facility are referred for outside or specialty medical care that is coordinated by Wellpath. Id. at ¶32. Milwaukee County is not aware of any widespread practice of violations of its express healthcare policies by County employees or Wellpath employees. Id. at ¶33. Milwaukee County does not follow a policy or practice of unduly denying or delaying provision of medical care, either on-site or offsite, for any reason, financial or otherwise. Id. at ¶34.

C. Chronology of the Plaintiff's Medical Care

1. *Hernia Care (August 16, 2021 to January 25, 2022)*

During the plaintiff's initial health screening on August 27, 2021, he reported an existing bi-inguinal hernia that had developed at the facility where he was confined before his transfer to the jail. Id. at ¶¶47-48. The plaintiff said that surgery to repair the hernia previously had been scheduled, and that record of this would be present in his medical records held by the Dodge County Jail. Id. at ¶49. The plaintiff signed a Release of Information ("ROI") so that Wellpath could obtain his medical records, and on September 8, 2021, Wellpath sent the executed ROI to the Dodge County Jail. Id. at ¶¶50-51. Three weeks later, on September 29, 2021, Wellpath received the plaintiff's medical records, but the records did not contain any reference to a previously scheduled surgery. Id. at ¶¶52-53. The plaintiff then advised that his hernia had been treated at an outside clinic, Marshfield Medical Center, while he was at Dodge. Id. at ¶54. The plaintiff executed a ROI for his medical records from that clinic. Id. at ¶55.

On November 9, 2021, Wellpath received medical records from Marshfield which were dated June 23, 2021, stating that the plaintiff had a right inguinal hernia that "would benefit" from surgical repair. Id. at ¶56. The records did not indicate an urgent need for surgery. Id. The plaintiff was informed that Wellpath had received records and would promptly start the process for referring the plaintiff to an outside specialist. Id. at ¶57. Once it received the Marshfield records, Wellpath was able to make a referral for hernia repair surgery. Id. at ¶58. Pending the offsite consultation, Wellpath continued to monitor the plaintiff's hernia condition. Id. at ¶59.

During this period, the plaintiff began to report an escalation of symptoms, prompting Wellpath to seek immediate evaluation and urgent surgery:

> a. On December 15, 2021, [the plaintiff] complained of vomiting and high levels of pain. (*Id.* at 884.) An examination later that day showed the hernia had grown large and tender. (*Id.*)
>
> b. On December 31, 2021, [the plaintiff] was transported to St. Luke's South Shore Hospital for a CT scan of his abdomen and pelvis. (*Id.* at 148.)
>
> c. On January 3, 2022, [the plaintiff] presented to the jail clinic complaining of pain and nausea and noting that the hernia was growing in size. Examination showed the hernia had grown firm and "very tender." In response, an urgent referral for outside treatment was placed. (*Id.* at 886.)
>
> d. The next day, on January 4, 2022, [the plaintiff] was transported to AMG Surgical Specialists for evaluation of the hernia. (*Id.* at 140.)

> e. A Consulting Physician's Report dated January 4, 2022 reflected a diagnosis that [the plaintiff's] hernia had become incarcerated[5] and required urgent surgical intervention. (*Id.* at 147.)
>
> f. On January 5, 2022, a referral for surgery approval had been entered, and the need for a pre-surgery physical and medical history appointment was noted. (*Id.* at 875.)
>
> g. On January 14, 2022, [the plaintiff] was seen for a pre-surgery appointment. At this appointment, [the plaintiff] denied warning signs that the hernia was strangulated—namely, abdominal swelling, blood in stool, fevers, and chills. He was instructed to immediately inform medical staff if he noted these red-flag symptoms. He did not report any such symptoms prior to his surgery. (*Id.* at 873-74; 454-56.)

Id. at ¶59.

On January 25, 2022, the plaintiff received hernia repair surgery. Id. at ¶60. Throughout this time, the plaintiff was provided pain relief (naproxen and Tylenol) and laxatives to alleviate pain related to the hernia and other issues. Id. at ¶61.[6] After surgery, the plaintiff received follow-up care from Wellpath:

> a. He was seen on January 26, 2022, the day following the repair surgery. He reported pain of 5/10, with no nausea or vomiting. He was instructed not to lift weights greater than 25 pounds and to avoid strenuous activity for 4-6 weeks. He was educated as to the signs of incision-site infection. (*Id.* at 862-63.)
>
> b. [He] was initially prescribed hydrocodone/acetaminophen, but the prescription was modified to Tylenol-3 (i.e., Tylenol with codeine). (*Id.* at 682.)
>
> c. On February 24, 2022, [the plaintiff] was seen by the provider who performed the surgery. The Consulting Physician's report noted no

[5] An incarcerated hernia is trapped by the muscles in the abdomen; it will not move back into the abdomen on its own or when pushed. https://my.clevelandclinic.org/health/diseases/incarcerated-hernia.

[6] The plaintiff states that he explained to medical staff that Tylenol was ineffective. Dkt. No. 84 at 24. He provides a record citation, but the court cannot locate the records he cites.

further follow-up needed unless there was pain, swelling, or other questions or concerns. (*Id.* at 145; 860.)

d. On February 25, 2022, [the plaintiff] was seen in the jail clinic for a follow-up after the surgery. He stated that he was told "everything is good" and no further follow-up was needed. (*Id.* at 857-58.)

e. On March 4, 2022, [the plaintiff] stated he was feeling much better as to his hernia, denied nausea and vomiting, trouble eating, drinking, and using the bathroom. (*Id.* at 855.)

f. [The plaintiff] required no further care for the hernia. (*See generally id.*)

Id. at ¶62.

2. *Shoulder Treatment*

On August 27, 2021, shortly after his arrival at the jail, the plaintiff showed tenderness in his right shoulder with possible deformity from a previously healed fracture. Id. at ¶63. He also had tenderness in his lumbar spine with intermittent sciatica in his right leg. Id. The plaintiff was ordered to receive physical therapy and an X-ray. Id. Four days later, the plaintiff was seen for physical therapy. Id. at ¶64. He complained of low back pain beginning in 2008 and shoulder pain beginning in 2007, which had been treated with a combination of physical therapy and Percocet. Id.

On September 7, 2021, shoulder X-ray imaging was performed which showed a previously healed fracture and continuing A/C joint separation. Id. at ¶65. The plaintiff was notified of the results, and an appointment was scheduled for a treatment plan. Id. On September 10, 2021, the plaintiff was seen in his cell for right shoulder pain. Id. at ¶66. He was instructed to continue his course of naproxen, Tylenol, muscle rub and physical therapy. Id.

On September 18, 2021, the plaintiff was seen in response to a sick call slip complaining of severe back and shoulder pain. Id. at ¶67.

On September 29, 2021, records received from Dodge County indicated a history of chronic knee and back pain and potential herniated discs in the plaintiff's lower back. Id. at ¶68. On October 5, 2021, the plaintiff was seen for physical therapy during which he was treated with electrical stimulation therapy and manual stretches. Id. at ¶69. He reported no changes to the condition of his sciatica and right shoulder pain. Id. On October 26, 2021, the plaintiff refused physical therapy. Id. at ¶70.

On November 12, 2021, the plaintiff was seen in response to a sick call slip regarding treatment for his A/C joint separation. Id. at ¶71. A repeat X-ray of his right shoulder was ordered. Id. On November 19, 2021, the plaintiff was seen in response to a sick call slip regarding his separated A/C joint. Id. at ¶72. A referral for orthopedic evaluation was placed. Id. Four days later, an X-ray was performed of his right shoulder which showed mild degenerative joint disease with no fracture or dislocation, an old clavicle fracture and an old A/C joint separation. Id. at ¶73. At an appointment on December 15, 2021, the plaintiff complained of shoulder and back pain, but his primary complaint was related to his hernia. Id. at ¶74.

On February 14, 2022, a Wellpath provider requested a third X-ray of the right shoulder. Id. at ¶75. The X-ray, which was performed on March 1, 2022, showed no acute fracture or dislocation. Id. at ¶76. On March 4, 2022, the plaintiff was seen following another complaint of A/C joint separation. Id. at

¶77. He denied recent trauma to his shoulder and claimed he could still feel the joint separation. Id. The plaintiff's right shoulder did not exhibit any bulging or dislocation, and he could lift his arm to ninety degrees. Id. Four days later, the plaintiff was seen in the housing unit in response to a sick call slip requesting treatment for low back pain, tingling in hand and toes, and "incontinence/ED [erectile dysfunction]/muscle spasms." Id. at ¶78. The next day—March 9, 2022—the plaintiff was seen in the clinic. Id. at ¶79. He complained of back pain with bladder incontinence and said that neurosurgery had been recommended before his incarceration. Id. The plaintiff was informed that his symptoms warranted pain management and would warrant an outside neurologist referral if they worsened. Id. The plaintiff's Tylenol dosage was increased. Id.

On March 15, 2022, the plaintiff again refused physical therapy. Id. at ¶80. Six days later, on March 21, 2022, he was seen in clinic during which he complained of sciatic nerve pain and incontinence. Id. at ¶81. His Tylenol prescription was continued, and he was instructed to continue physical therapy. Id. On March 25, 2022, the plaintiff was seen in response to a sick call slip complaining of back and shoulder pain. Id. at ¶82. He was prescribed a course of Tylenol extra strength. Id.

The plaintiff did not complain of right shoulder pain again until May 25, 2023, more than a year later. Id. at ¶83. On June 12, 2023, the plaintiff complained of shoulder pain before his discharge from the jail. Id. at ¶84. This

was reported as bilateral shoulder pain following his cervical fusion surgery. Id. No mention is made of the old A/C joint separation as the source of pain. Id.

3. *Spine/Nerve Treatment*

On April 4, 2022, the plaintiff was seen in response to a sick call slip complaining of an increase in urinary incontinence and right leg numbness. Id. at ¶85. Due to a security lockdown, the assessment was limited, but the provider stated that a urine test would be done and offered an adult diaper in the meantime. Id. Nine days later, on April 13, 2022, the plaintiff had a follow-up appointment during which he said that the incontinence had begun two months prior, denied blood in his urine and denied bowel incontinence. Id. at ¶86. The plaintiff's urinalysis was normal. Id. He complained of back pain, stiffness, right side pain, muscle spasms in his back and a right foot lag. Id. The plaintiff was instructed as to symptoms that would require emergency attention and was encouraged to use adult diapers in the meantime. Id. at ¶88. The plaintiff reported that he had had MRI imaging done in 2018 at Pekin Correction Institution, and that Wellpath requested these records. Id. at ¶89.

On April 15, 2022, the plaintiff was seen in response to a sick call complaining of bladder incontinence, and (for the first time) bowel incontinence. Id. at ¶90. He said that he had a herniated disc and complained of numbness radiating from his waist down both legs. Id. The plaintiff was prescribed oxybutynin and was scheduled for a follow-up in one week. Id. Six days later, on April 21, 2022, the plaintiff was seen for a follow-up regarding

incontinence and the oxybutynin, during which the plaintiff said he refused to take oxybutynin because he did not think it would be effective. Id. at ¶92.

At a May 10, 2022 follow-up appointment, the plaintiff said his incontinence had improved but was not fully resolved and he complained of pain in lower back radiating down his right leg. Id. at ¶95. The plaintiff said that when he was incarcerated at Pekin, he had been told he should see a spinal surgeon, and he requested a referral for spinal surgery. Id. The plaintiff also said he had a fall with a herniated disc "some years ago," had undergone multiple rounds of physical therapy, had cortisone injections in his back and had aqua-therapy. Id. at ¶96. The provider note indicates that no records had been received from Pekin, and that the plaintiff's records from Dodge did not indicate a "work-up" related to back pain. Id. at ¶97. The plaintiff's Tylenol prescription was renewed, and a lumbar/sacral X-ray was ordered. Id. at ¶98. The plaintiff also was provided with a heating pad, extra clothing and blankets, and muscle rub. Id.

On May 17, 2022, a lumbar spine and sacrum X-ray was performed. Id. at ¶99. The result showed mild levoscoliosis and mild loss of space height at the L5/S1 junction but was otherwise normal. Id. Three days later, the plaintiff was seen for a follow-up after the X-ray. Id. at ¶100. Because of the ongoing reports of bowel and bladder incontinence, together with occasional saddle anesthesia during bowel movements, and paresthesia in his right leg, it was determined he would benefit from a neurosurgery consultation, and an off-site appointment was scheduled. Id.

On May 22, 2022, in response to a sick call slip asking why his pain meds "keep going off," the plaintiff again was informed that pain medication prescriptions were short term and that he needed to request refills. Id. at ¶101. His Tylenol prescription was renewed. Id. On May 25, 2022, Wellpath sent a second, urgent, request to Pekin for the plaintiff's medical records. Id. at ¶102. The next day, the records from Pekin were received and reviewed. Id. at ¶103. The records showed that a February 15, 2019 MRI revealed diffuse facet osteoarthropathy and congenital foreshortening of vertebral pedicles, as well as moderate canal narrowing at L4-5 and degeneration and bulging of the L5-S1 disc with moderate central canal stenosis. Id.

On June 7, 2022, the plaintiff was seen for a chronic care follow-up. Id. at ¶104. The provider notes state that he would benefit from a lumbar CT scan to investigate the cause of incontinence and saddle paresthesia, and that an offsite referral request for such imaging would be placed. Id. On June 22, 2022, the plaintiff was seen in response to a sick call slip complaining of incontinence and back pain. Id. at ¶105. He requested that his Tylenol prescription be renewed, and this request was granted. Id. On July 1, 2022, the plaintiff was seen for a chronic care follow-up. Id. at ¶106. He complained of ongoing back pain and declined incontinence products. Id. The plaintiff was given accommodation of a bottom bunk, extra blankets and extra clothing. Id.

On August 12, 2022, in response to a sick call slip asking about the status of his offsite neurosurgery consultation and complaining of a lack of pain medication, the plaintiff again was informed that pain medication

prescriptions are temporary, and that he must request refills of such prescriptions. Id. at ¶107. On August 26, 2022, an MRI of the plaintiff's right spine was ordered due to his ongoing complaints of bilateral lower extremity radiculopathy, incontinence and saddle anesthesia. Id. at ¶108.

On September 23, 2022, the plaintiff could not be seen for an outside MRI appointment because jail staff lacked MRI-safe restraints. Id. at ¶109. On October 7, 2022, the plaintiff was seen for a chronic care follow-up at which he complained of continued low back pain and occasional incontinence. Id. at ¶111. The provider notes for this visit state that the MRI had been rescheduled, and the plaintiff was scheduled for a chronic care follow-up in thirty days. Id. Six days later, on October 13, 2022, the rescheduled MRI was performed. Id. at ¶112. The MRI impression stated: "Variable lumbar spondylosis superimposed upon a background of a small caudally tapering thecal sac. Due to a combination of factors, there is severe spinal canal stenosis at L4/L5 and moderate narrowing at L2/L3 and L3/L4." Id. Four days later, the plaintiff was seen to discuss the results, and a neurology referral was placed. Id. at ¶114.

On November 1, 2022, the plaintiff was seen for a chronic care follow-up. Id. at ¶115. He complained of worsening back pain and occasional bladder incontinence. Id. Ten days later, on November 11, 2022, the plaintiff was seen offsite for a neurosurgery consultation. Id. at ¶116. The provider noted potential cervical myelopathy and recommended an MRI of the brain and cervical spine. Id. The plaintiff received sacroiliac joint injections. Id.

On November 16, 2022, the plaintiff was seen for a follow-up after his neurosurgery consultation and a referral was submitted for a cervical spine MRI. Id. at ¶117. At a chronic care follow-up on November 25, 2022, the plaintiff said that his back pain improved with Tylenol 3 (Tylenol with codeine) and tizanidine, which had been prescribed until he could receive the spinal injection treatment. Id. at ¶118. He reported that his incontinence had stopped since the pain was better controlled. Id. The plaintiff's mobility and spinal range of motion was improved, he was able to walk without dragging his right foot and was able to sit and stand straight. Id.

On December 16, 2022, the plaintiff received spinal injections of Xylocaine and Depo-Medrol at an offsite visit. Id. at ¶121. Three days later, the plaintiff was seen for a chronic care follow-up where he reported an improvement in pain to "5/10." Id. at ¶122. The plaintiff had increased spinal mobility, was able to do his physical therapy exercises, no longer dragged his right foot when walking and his incontinence had decreased. Id. The plaintiff's pain medication was changed back to standard Tylenol, but his prescription for tizanidine was renewed. Id.

On December 25, 2022, the plaintiff was seen in response to a sick call slip complaining of back pain. Id. at ¶123. He claimed the spinal injection was no longer providing relief, and that he wanted to increase his dosage of tizanidine. Id. He complained of back pain radiating down his right leg. Id. It is noted that he had another injection appointment scheduled. Id. He did not receive an increased dosage of tizanidine, but his Tylenol prescription was

renewed. Id. On January 6, 2023, the plaintiff again requested an increased dose of tizanidine, which was denied. Id. at ¶124.

On January 9, 2023, an MRI of the plaintiff's cervical spine was performed. Id. at ¶125. The next day, the plaintiff was seen for a chronic care follow-up. Id. at ¶126. He reported that the injection did not give long-term relief, and that his pain level was back up to "10/10." Id. He complained of back pain radiating down his right buttock and leg as well as incontinence. Id. The plaintiff requested additional and different pain medication but declined to trial gabapentin and Lyrica. Id. A follow-up with a spinal surgeon was scheduled for later in the month. Id.

On February 1, 2023, the plaintiff was seen off-site at Aurora Spine Care where he was diagnosed with cervical myelopathy and cervical stenosis. Id. at ¶127. The treating physician recommended CT angiography of neck; cervical flexion-extension X-ray; and posterior cervical decompression and fusion of C2-T2, with tramadol for pain management. Id. At a follow-up visit the next day, the plaintiff's orders of Tylenol and tizanidine were continued (with an increase in his tizanidine dosage), and he was ordered an extra mattress. Id. at ¶128. Aurora offered cervical spine surgery in May or June 2023. Id. at ¶129.

On February 8, 2023, the plaintiff was seen in response to a sick call slip requesting lidocaine cream and stronger pain medication. Id. at ¶130. He complained of continued upper and lower back pain and numbness and tingling in feet and hands. Id. Tizanidine, a high dose of acetaminophen and Aspercreme (lidocaine cream) were ordered. Id. The next day, the plaintiff was

seen for a chronic care follow-up appointment during which he complained of continued pain rated at "10/10." Id. at ¶131. He was informed that prescribed pain medication cannot eradicate pain. Id. The plaintiff agreed to trial gabapentin and to undergo the recommended neurosurgery. Id. His extra mattress and other restrictions were kept in place. Id. A referral for cervical spine surgery in May or June was placed. Id.

On February 24, 2023, in response to a sick call slip requesting orthopedic shoes, the plaintiff was informed that such shoes were not indicated for his diagnosis of spinal stenosis. Id. at ¶132. His gabapentin, Tylenol and tizanidine prescriptions were continued. Id. That same day, the plaintiff was seen under a mental health referral in response to complaints of anxiety, stress, depression, fear and lack of sleep. Id. at ¶133. He complained that his medical concerns were not being taken seriously. Id.

On February 27, 2023, the plaintiff was seen in response to a sick call slip complaining of painful tingling down his back to his feet, which caused him to fall over, strike his head and urinate. Id. at ¶134. He asked for different pain medication, claiming that gabapentin made him feel "funny," and that Aspercreme, Tylenol and the epidural injection did not help. Id. It was noted that other medications (Tylenol 3 and Tramadol) were not indicated for his condition, and that his course of treatment, including a follow-up with spinal surgery, would be continued. Id. The plaintiff said he understood and agreed. Id.

On March 5, 2023, the plaintiff was seen at his cell for an emergency. Id. at ¶135. He was observed on the floor, complaining that he fell while trying to use the toilet and that he lost bladder control. Id. He was able to move his legs and did not exhibit stroke symptoms. Id. He was able to get up without assistance, and his vitals were taken. Id. The next day, the plaintiff was seen for a chronic care follow-up. Id. at ¶136. He reported upper and low back pain with sciatica, a diagnosis of spinal stenosis, cervical stenosis, arthritis and degenerative joint disease. Id. He rated his pain at "10/10," though he said his prescription of "tizanidine definitely help[ed]" his muscle spasms. Id. It is noted that surgical intervention was scheduled for May 2023. Id.

On March 10, 2023, the plaintiff was seen in response to two sick call slips; the first was to request his medical records, and the second was to complain of loss in sensation in his legs, increased incontinence, tremors, pain, poor balance and more frequent episodes of falling. Id. at ¶137. He asked to be taken off gabapentin and prescribed Percocet. Id. When seen, he was observed ambulating and standing without assistance. Id. He was offered lower-tier level restrictions so that he would not have to use stairs, but he declined. Id. The plaintiff was told the off-site surgeon would be informed of his concerns. Id. He agreed to increased gabapentin. Id.

On March 15, 2023, Wellpath informed the plaintiff's surgeon of his worsening condition. Id. at ¶138. Surgery was moved up to May 2, 2023. Id. Also on March 15, the plaintiff was seen in response to a sick call slip complaining of the side effects of gabapentin and increased pain and

requesting a Percocet prescription. Id. at ¶139. The plaintiff's surgery was moved up to April 18, 2023, with a CT scan of his neck and a pre-surgery physical scheduled for April 11, 2023. Id. Tylenol #3 was ordered for thirty days. Id.

On April 3, 2023, the plaintiff had a chest X-ray performed at Aurora St. Luke's. Id. at ¶144. Three days later, Wellpath received pre- and post-surgery instructions for the plaintiff's care. Id. at ¶145. On April 8, 2023, the plaintiff's tizanidine prescription was refilled through the surgery date. Id. at ¶146. The next day, the plaintiff was seen in response to emergent kidney pain. Id. at ¶147. He reported blood in his urine. Id. A urinalysis was conducted and the plaintiff tested positive for a urinary tract infection. Id. It was noted that the UTI should be treated before surgery. Id.

On April 10, 2023, the plaintiff was seen at Aurora St. Luke's for a carotid CT scan before his surgery. Id. at ¶148. On April 28, 2023, the plaintiff was seen for a pre-surgery history and physical. Id. at ¶153. He reported no change in his symptoms and that the treatment of his UTI had been effective. Id. The plaintiff's Tylenol #3 prescription was refilled per his request, and it was noted he was allowed to have it twice daily until surgery. Id.

On May 18, 2023, the plaintiff received posterior cervical surgery. Id. at ¶157. The surgery was a decompression and fusion of C2-T2, a major surgery fusing together six cervical vertebrae and two thoracic vertebrae. Id. On May 22, 2023, the plaintiff was seen in clinic for a post-operative follow-up. Id. at ¶159. He complained of neck pain and numbness of his right arm and leg and

stated that he did not think the cervical spine surgery had helped his symptoms. Id. Because the plaintiff had not yet started the course of prescribed muscle relaxer (cyclobenzaprine) and tramadol, Wellpath ordered a follow-up to allow the pain medications to take effect. Id.

On May 25, 2023, the plaintiff was seen for another post-operative follow-up during which he complained of high levels of pain. Id. at ¶161. He reported that the tramadol did not control his pain. Id. The plaintiff was prescribed Tylenol #3, and his cyclobenzaprine prescription remained in place. Id. On May 29, 2023, the plaintiff was seen for a wellness check. Id. at ¶162. He complained of high levels of pain and said that his medication was not controlling his pain. Id. The next day, the plaintiff was seen for a chronic care follow-up. Id. at ¶163. He complained again of high levels of pain and his Tylenol #3 dosage was increased. Id. On May 30 and 31 and June 1, 3, 4 and 5, 2023, the plaintiff was seen for wellness checks. Id. at ¶164. He did not express complaints. Id.

On June 1, 2023, the plaintiff was seen offsite for surgery follow-up. Id. at ¶165. It was noted that the incision was healing well. Id. The recommended treatment was to continue the use of Tylenol #3 and muscle relaxers, wear a cervical collar and continue daily dressing changes. Id. Half of his staples were removed. Id. The next day, the spine clinic gave instructions on the use of a bone stimulator collar as follow-up treatment to the plaintiff's spinal surgery. Id. at ¶166. On June 6, 2023, the plaintiff was seen in the housing unit for an additional follow-up during which he reported his pain was adequately

controlled and that he was using the bone stimulator as directed. Id. at ¶167. On June 7, 8, 9 and 10, 2023, the plaintiff was seen for wellness checks and expressed no complaints. Id. at ¶168.

On June 12, 2023, the plaintiff was seen for a pain management follow-up. Id. at ¶169. He reported fair pain control and some residual numbness in his right hand and arm. Id. The plaintiff was agreeable to a long-term plan to wean off Tylenol #3 and trial nortriptyline. Id. The next day, the plaintiff was seen for a wellness check and expressed no complaints Id. at ¶170. On June 14, 2023, the plaintiff was seen for a follow-up at the spine clinic. Id. at ¶171. On June 15, 2023, he was seen for a follow-up. Id. at ¶173. He reported no change in pain with the current dosage of nortriptyline, so his dosage was increased. Id. His remaining staples were removed. Id. On June 19, 2023, the plaintiff was seen for a follow-up. Id. at ¶174. He reported no change in pain with the increased dosage of nortriptyline, so his dosage was increased again. Id.

On June 20, 2023, the plaintiff received an X-ray in preparation for a follow-up with the offsite spine clinic. Id. at ¶175. On June 22, 23, 24, 25, 26, 27, 28 and 29, 2023, he was seen for wellness checks and expressed no complaints. Id. at ¶176. On June 23, 2023, the plaintiff was seen for a pain management follow-up. Id. at ¶177. He reported minimal improvement in pain, so his nortriptyline dosage was increased again. Id. On June 27, 2023, the plaintiff was seen for a chronic care follow-up. Id. at ¶178. He reported high pain levels, lumbar pain with radiation and weakness down his right side,

tingling in toes, unchanged cervical spine pain. Id. He reported his incontinence had stopped. Id. His nortriptyline dosage was increased, his Tylenol #3 and cyclobenzaprine prescriptions were continued and he was referred to physical therapy for the right arm weakness. Id. Wellpath was awaiting further recommendations from the neurosurgeon, with a thirty-day follow-up appointment scheduled. Id.

On June 30, 2023, the plaintiff had a follow-up telehealth visit with the neurosurgeon. Id. at ¶179. It was noted that he had no restrictions, could discontinue the use of the cervical collar and that an MRI of his lumbar spine would be ordered. Id. On July 21, 2023, Wellpath completed a transfer summary for the continuity of the plaintiff's care. Id. at ¶180.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Discussion

The defendant contends that it is entitled to summary judgment because the plaintiff cannot prove the existence of a Milwaukee County policy or practice that caused his alleged injuries. Dkt. No. 65 at 4. The defendant also contends that the plaintiff's medical care complaints are groundless. Id. at 11. According to the defendant, the plaintiff received comprehensive, responsive and compassionate medical care. Id. at 12. The defendant asserts that the care the plaintiff received did not approach the "objectively unreasonable" standard of a Fourteenth Amendment claim. Id.

The plaintiff responds that the constitutional violation was caused by an official policy, namely, the contract between Wellpath and Milwaukee County. Dkt. No. 82 at 2. He asserts that the agreement provides for Wellpath to have

its own grievance process for healthcare issues, which leaves incarcerated persons' grievances to be heard by the provider they are complaining about and results in a "cyclonic" pattern of treatment delays. Id. at 3-5. The plaintiff states that he would have felt that his health and safety were important if Milwaukee County had: (1) properly investigated grievances complaining of mistreatment and treatment delays and (2) requested a meeting with the on-site physician and asked for an "accepted medical justification that will effectively debunk the griever's allegations of deliberate indifference to serious medical needs." Id. at 6-7.

The plaintiff contends that his medical conditions—hernia, shoulder pain, back and spine issues, neck and nerves—amounted to serious medical needs. Id. at 9-10. He contends that Wellpath utilized a policy of "release of information (ROI)" to obtain records from his previous healthcare providers, which delayed needed treatment. Id. at 11. The plaintiff states that he experienced months of severe pain due to his hernia, back, neck, spine and nerve issues while waiting for records, during which time he was given only over-the-counter pain medication. Id. He asserts that his treatment consisted of little more than documenting his worsening conditions and continuing ineffective treatment. Id. at 13. The plaintiff states that officials persisted in an ineffective course of treatment. Id. at 18.

The defendant filed a reply in which it contends that the court should grant summary judgment in its favor because there is no evidence of a written policy or widespread practice which caused the plaintiff's alleged injuries, and

the plaintiff has offered no evidence that Wellpath's treatment of his medical conditions was objectively unreasonable. Dkt. No. 89 at 1. The defendant argues that the treatment the plaintiff received was well within the accepted standards of care for his condition, and that there is no underlying constitutional violation to support a Monell claim. Id.

A §1983 claim that a state pretrial detainee has received inadequate medical care is predicated on the rights secured by the Fourteenth Amendment's Due Process Clause. James v. Hale, 959 F.3d 307, 318 (7th Cir. 2020) (citing Miranda v. County of Lake, 900 F.3d 335, 346-47 (7th Cir. 2018)). Claims of inadequate medical care while in pretrial detention are subject to an objective reasonableness standard. Id. (citing Miranda, 900 F.3d at 352). The plaintiff bears the burden to demonstrate objective unreasonableness and must make a two-part showing. Id. First, he must show that the defendant acted purposefully, knowingly or recklessly when considering the consequences of its response to the medical condition at issue in the case. Id. (citing McCann v. Ogle County, Ill., 909 F.3d 881, 886 (7th Cir. 2018)). Second, he must show that the challenged conduct was objectively unreasonable given the totality of the relevant facts and circumstances. Id. "Conditions are objectively unreasonable if they are imposed expressly to punish or are excessive in relation to a legitimate purpose." Lee v. Milwaukee County, Wis., 175 F.4th 877, 884 (7th Cir. 2026) (citing Hardeman v. Curran, 933 F.3d 816, 821-22 (7th Cir. 2019)).

The plaintiff's claim is only against defendant Milwaukee County, meaning he has additional hurdles to clear under Monell, "which requires §1983 liability against local governments to be direct and not vicarious." Lee, 175 F.4th at 884. Generally speaking, under Monell, the plaintiff must: (1) "show that he was 'deprived of a federal right'; (2) trace the deprivation to some municipal action (i.e., a policy or custom) . . . attributable to the municipality itself; (3) show 'municipal fault'; and (4) show that 'the municipal action was the moving force behind the federal-rights violation.'" Id. (quoting Dean v. Wexford Health Sources, Inc., 18 F.4th 214, 235 (7th Cir. 2021)).

The "first and most basic element" of the plaintiff's Monell claim is whether he suffered a constitutional injury. Id. at 885. To satisfy this element, the plaintiff first must show that "the care he received was objectively unreasonable—that is, insufficient to abate a 'serious risk of harm' from a reasonable officer's perspective." Id. (quoting Pittman *ex rel.* Hamilton v. Madison County, 108 F.4th 561, 571-72 (7th Cir. 2024)). The plaintiff also must show that, as a result, he was harmed. Id. (citing Miranda, 900 F.3d at 347).

The plaintiff arrived at the jail on August 16, 2021, and at his initial health screen on August 27, 2021, he said that he had been scheduled for surgery for a hernia while at his prior institution. The plaintiff was provided with pain relief and laxatives for his hernia while the jail requested medical records from the prior institution. The records arrived on September 21, 2021, but did not say anything about a hernia. Wellpath then learned that the

plaintiff had been treated at an offsite clinic and requested *those* records, which arrived on November 9, 2021, and which said that the plaintiff "would benefit" from surgery for his hernia. Wellpath then began the process of scheduling surgery. While the surgical referral was pending, the plaintiff reported symptoms suggesting that the hernia had become incarcerated, and Wellpath placed an urgent referral for outside care. Wellpath also educated the plaintiff about symptoms that would indicate he needed emergency surgery and directed him to notify staff if he experienced those symptoms. The plaintiff had surgery on January 25, 2022 (approximately five months after his arrival at the jail), and achieved a complete recovery in a month.

A hernia can be an objectively serious medical condition. Gonzalez v. Feinerman, 663 F.3d 311, 314 (7th Cir. 2011). The plaintiff had surgery for his hernia less than five months after his initial health screen at the jail. During that time, Wellpath monitored the plaintiff's condition, provided him with pain medication and laxatives and obtained his medical records from the offsite clinic where he had previously been seen for his hernia. When the plaintiff's symptoms worsened, Wellpath made an urgent referral for treatment. Wellpath did not disregard the plaintiff's condition, nor did it refuse to treat him. A reasonable factfinder could not conclude that the treatment the plaintiff received for his hernia was objectively unreasonable. See Swisher v. Porter C'nty Sheriff's Dep't, 761 F. App'x 616, 618, 620 (7th Cir. 2019) (jail doctor who treated pretrial detainee's reducible hernia conservatively, with a hernia belt and Tylenol for pain, and who denied detainee's request for surgery and a

second opinion, did not violate detainee's rights under the Fourteenth Amendment); cf. Gonzelez, 663 F.3d at 315 (incarcerated individual suffered from hernia for seven years, and for the last two years hernia "continued to worsen, was constantly protruding, and was causing extreme pain[;]" doctors who never altered their response to hernia over last two years persisted in an ineffective course of treatment which could support deliberate indifference claim).

Likewise, Wellpath reasonably treated the plaintiff's shoulder condition. After the plaintiff complained of shoulder pain during his initial health screen on August 27, 2021, Wellpath started him on a course of physical therapy and performed an x-ray which showed A/C joint separation and a previously healed fracture. In addition to physical therapy, the plaintiff received pain medication and muscle rub. His pain medication was increased due to complaints of shoulder pain and back pain. Additional X-rays showed no acute complications. The plaintiff ceased complaining of shoulder pain in March 2022 until right before he was transferred to another facility in July 2023. Wellpath's treatment of the plaintiff's shoulder pain did not violate his constitutional rights. See Clayborne v. Godiwalla, Case No. 22-cv-95, 2024 WL 5105555, at *4 (E.D. Wis. Nov. 8, 2024) (defendants who treated pretrial detainee's chronic shoulder pain with different pain medications and physical therapy did not render constitutionally inadequate care); see also Williams v Ortiz, 937 F.3d 936, 943 (7th Cir. 2019) (medical professional who provided pain medication, adjusted the treatment plan when the plaintiff complained the

pain medication was not working, tried different pain medication and encouraged the plaintiff to do physical therapy to help mitigate the chronic pain did not provide objectively unreasonable care).

Nor did Wellpath's treatment for the plaintiff's back, neck and nerve issues violate the Constitution. When the plaintiff reported pre-existing back and sciatic issues during his initial health screening, Wellpath placed him on a course of physical therapy and prescribed pain medication. In March 2022, seven months after the plaintiff arrived at the jail (and two months after his hernia repair surgery), his symptoms began to change, and he reported worsening sciatic pain radiating down his legs and episodes of urinary incontinence. Wellpath conducted a urinalysis and prescribed oxybutynin to treat bladder incontinence. The next month, the plaintiff began complaining of periodic bowel incontinence. The plaintiff said he had had an MRI at Pekin where he was previously incarcerated, and Wellpath obtained the plaintiff's records from that institution. In May 2022, the plaintiff underwent a lumbar X-ray, and he also reported saddle paresthesia for the first time. After he continued to complain of incontinence periodically throughout the summer of 2022, Wellpath scheduled an MRI. The procedure originally was scheduled for September, but it did not take place until October 2022 because the transport officers lacked MRI-safe restraints. After the October MRI, which showed moderate to severe issues with the plaintiff's lumbar spine, a neurosurgery consult was placed. In November 2022, the plaintiff was seen off-site for a neurosurgery consultation during which the provider noted issues with his

cervical spine and ordered a cervical MRI. At that appointment, the plaintiff received a sacroiliac joint injection which provided lumbar pain relief, improved spinal mobility and range of motion and temporarily halted incontinence episodes. In December, the plaintiff received additional steroid spinal injections off-site.

The plaintiff's cervical spine MRI was performed in January 2023. The plaintiff reported that the initial course of injections was no longer providing relief and that he was experiencing incontinence again. He was seen off-site by a specialist the following month who recommended more imaging, pain medications and ultimately spinal surgery. Wellpath increased the plaintiff's pain medication prescription, and the surgeon offered cervical fusion surgery in May or June 2023. The appointment was scheduled for May 2, 2023, and then it was moved up to April 18, 2023. Unfortunately, the plaintiff reported blood in his urine and was diagnosed with a UTI, so the surgery had to be delayed. On May 18, 2023, the plaintiff underwent cervical and thoracic spine fusion surgery. After the surgery, he was seen frequently for follow-up appointments, and he reported continued cervical pain while he recovered from surgery. The plaintiff was prescribed tramadol and cyclobenzaprine for pain control, and Tylenol with codeine was prescribed when the plaintiff reported that the tramadol was ineffective. He was also provided with a bone stimulator to encourage proper fusion. By early June 2023, the plaintiff reported that his pain was adequately controlled. He experienced recurring pain for which he was seen at the jail and off-site, and different pain medications and dosages

were used to manage the pain. The plaintiff was discharged from Wellpath's care on July 21, 2023.

The record shows that the plaintiff received ongoing care in evaluating and treating his back, spine, neck and nerve issues. The plaintiff is dissatisfied with the treatment he received. He believes his surgery was unnecessarily delayed and that his pain wasn't properly managed. But the record shows that he was consistently seen whenever he made a complaint about his condition. The plaintiff has not established that it was unreasonable for Wellpath to obtain his prior medical records before referring him to an outside specialist, while treating him in the meantime. See Pyles v. Fahim, 771 F.3d 403, 411 (7th Cir. 2014) ("A prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care. Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only of that choice is blatantly inappropriate."). Likewise, the plaintiff has not established that the pain medication he received for his chronic conditions was objectively unreasonable or contrary to accepted medical practice. See Williams, 937 F.3d at 944 ("just because the staff declined to provide [the plaintiff] with his desired prescription pain medication . . . does not mean that the course of treatment was objectively unreasonable."). The plaintiff disagrees with the treatment he received, "but a mere disagreement with the physician of [the plaintiff's] medical treatment"

does not constitute a constitutional violation. Snipes v. DeTella, 95 F.3d 586, 591 (7th Cir. 1996) (citations omitted).

Based on the record before the court, the plaintiff cannot show that he suffered a constitutional injury. He arrived at the jail with chronic, painful medical conditions, and the record shows that Wellpath treated those conditions. He received extensive and ongoing assessments, evaluations and care for his medical needs, including obtaining his records from previous providers, various pain medications at different dosages, physical therapy, X-rays, MRIs, off-site specialist appointments, referrals and surgeries. The plaintiff has not shown that the treatment he received was contrary to accepted medical care standards. See Holloway v. Delaware C'nty Sheriff, 700 F.3d 1063, 1074 (7th Cir. 2012) (no constitutional violation if treatment decision is "based on the physician's professional judgment and does not go against accepted professional standards").

A reasonable factfinder could not conclude that the medical care the plaintiff received at the jail was unreasonable. With no underlying constitutional violation, the plaintiff's Monell claim fails. Friend v. City of Decatur, Ill., 183 F.4th 493, 501 (7th Cir. 2026) (citing Sallenger v. City of Springfield, 630 F.3d 499, 505 (7th Cir. 2010)). The court will grant the defendant's motion for summary judgment.

## III. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 64.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year

after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 8th day of September, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**